# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| PEOPLE'S CAPITAL AND LEASING CORP. § § § *Plaintiff,* § § v. § § § Civil Action No.  4:18-CV-00877 JOHN ALLEN MCCLUNG § Judge Mazzant *Defendant/Third-Party Plaintiff,* § § v. § § § JMOS ACQUISITION, LLC § *Third-Party Defendant.* § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is JMOS Acquisition, LLC's Motion for Summary Judgment and Brief in Support Thereof (Dkt. #153).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be granted.

### BACKGROUND

**Factual Background**

The motion for summary judgment before the Court concerns John Allen McClung's claims as a third-party plaintiff against a third-party defendant, JMOS Acquisition, LLC (Dkt. #153).

During the timeframe relevant to this dispute, McClung was the sole owner of JM Oilfield Service, Incorporated (Dkt. #98 at p. 34).  On around January 19, 2012, McClung executed a Master Lease Agreement (the "MLA") with Marquette Equipment Finance, LLC, a subsidiary of Meridian Bank, N.A. ("Marquette") (Dkt. #98 at p. 35; Dkt. #153 at p. 3).  The MLA was a leasing agreement for oilfield equipment, and McClung signed the MLA in his capacity as president of

JM Oilfield (Dkt. #111 at p. 7).  About one year later, McClung executed a Guaranty Agreement in his personal capacity—the Guaranty Agreement stated that McClung:

> unconditionally guarantees the full, complete and prompt payment, performance and observance of all of [JM Oilfield's] obligations under each [lease schedule entered into pursuant to the Master Lease Agreement], including without limitation the payment of rents and payment of all amounts required or provided for under each Lease resulting from [JM Oilfield's] breach or nonperformance thereof.

(Dkt. #111 at p. 7) (alterations in original).  Both the MLA and the Guarantee Agreement were assigned from Marquette to People's Capital and Leasing (Dkt. #111 at p. 1).

Around March 16, 2015, McClung and JMOS executed a Share Purchase Agreement (the "SPA") (Dkt. #98 at p. 34).  The SPA defined JMOS as the "Buyer" and McClung as the "Seller" (Dkt. #98 at p. 34).  As framed by McClung, the main purpose of the SPA was to sell the shares of both JM Oilfield and a separate corporation—Superior Oilfield Services, Inc.—to JMOS (Dkt. #98 at pp. 34–35).

### The SPA

Several provisions of the SPA are relevant here.  The SPA noted that JM Oilfield and Superior Oilfield, while not insolvent, were facing financial and operating challenges such that the two companies would likely be unable to obtain a "going concern" opinion on their financial statements (Dkt. #153 at p. 4; Dkt. #153, Exhibit 1 at p. 1).  So, JMOS was obligated under the SPA to:

> b.      Provide, for the benefit of [JM Oilfield] and [Superior Oilfield], a revolving bridge loan in the amount of One Million Dollars ($1,000,000.00), interest of Eighteen Percent (18%) with a term of one (I) year following the Closing Date (the "Revolving Bridge Loan").  All loan proceeds advanced under the Revolving Bridge Loan shall be used for the business purposes of [JM Oilfield].  After the Closing, [JMOS] will evaluate additional capital needs of [JM Oilfield] when and if [JM Oilfield] is able to produce timely and comprehensive financial reports. [JMOS's] decision for additional funding to meet such additional capital needs of [JM Oilfield] shall be in [JMOS's] sole and absolute discretion.

(Dkt. #98 at p. 35; Dkt. #153, Exhibit 1 at pp. 1–2).

The SPA also contained a lengthy indemnification clause:

> 20. <u>Indemnification</u>. [McClung] agrees to indemnify, defend, save and hold harmless [JMOS] from and against any and all claims, demands, actions, causes of action, damages, loss, costs, taxes, diminutions in value, interests on borrowed money, liability, fees (including attorney's fees) or expense, including amounts spent on investigation, defense or settlement of any claim which may be brought against [JMOS] and/or which [JMOS] may suffer, sustain, or become subject to as a result of, in respect of, or arising out of (i) any misrepresentation or breach of any representation, warranty or covenant made by [McClung], (ii) any non-tax related liability, obligation or commitment of [McClung] arising out of transactions entered into or events occurring prior to Closing, (iii) any tax-related liability, obligation or commitment, whether federal, state, or local, of JMO or SOS arising out of transactions, sales, payments, or ownership or transfer of real property entered into or events occurring prior to Closing, (iv) any non-tax related liability of [McClung] not expressly and explicitly disclosed to and assumed by [JMOS], and (v) the discovery of liabilities, invoices or obligations owing by JMO or SOS to one of its vendors, noteholders or other creditors in excess of the amount of $10,000.00 that is (a) either not disclosed or is listed in error on a listing of all accounts payable provided at the time of the Closing and (b) not resolved in full (i.e., down to "zero") or to an amount that is below such threshold amount (i.e., $10,000.00) within thirty (30) days of the Closing, or (vi) the discovery that any single piece of equipment, vehicle, item of inventory, vehicle parts, office equipment, personal property, account receivable or other tangible asset owned by JMO or SOS and listed on a current listing of such items that has a value in excess of $5,000.00 cannot be located or otherwise accounted for within thirty (30) days of the Closing. In the event [JMOS] intends to claim [McClung] has an indemnification obligation under this Section 18 (the "Claim"[)], [JMOS] shall notify [McClung] in writing of the Claim. After receipt of such notice, [McClung] shall work in good faith to resolve or satisfy the Claim within thirty (30) days of [JMOS's] notice, which resolution or satisfaction must be reasonably acceptable to [JMOS]. In the event [JMOS] does not accept [McClung's] resolution, if any, [JMOS] shall, prior to exercising any of its remedies at law, including the right to offset the Claim against the Note, establish a forum, time and place within thirty (30) days for a mediation of the Claim. If such mediation does not result in a resolution of the Claim, [JMOS] may proceed to exercise its legal remedies, including the right of offset of the Claim against the Note.

(Dkt. #153, Exhibit 1 at pp. 5–6). Essentially, McClung broadly agreed to indemnify JMOS—there was no reciprocity.

And the SPA contained a merger clause:

> 30. <u>Entire Agreement</u>. This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and

3

may not be amended or modified without the express prior written consent of the parties.

(Dkt. #153, Exhibit 1 at p. 9). Both McClung and JMOS "sought and received independent legal advice from counsel of their choice as to the advisability of executing" the SPA (Dkt. #153, Exhibit 1 at p. 10).

### The Alleged Implied Promises

McClung does not dispute that the SPA is a valid and binding contract—instead, McClung claims that "[i]n addition to the SPA, [McClung] and [JMOS] entered into an implicit, valid contract, the existence, and the terms, conditions and provisions of which, were manifested by the conduct of the parties" (Dkt. #98 at p. 40). Specifically, McClung points to "each such party accepting the benefits of the transaction memorialized in the SPA" as the type of "conduct" supporting the existence of an implied contract (Dkt. #98 at p. 40).

McClung elaborates on the supposed implied contract in his declaration, claiming that: "Aside from the SPA, JMOS and I entered into an implicit, valid contract at about the time we were negotiating the terms, conditions and provisions of the SPA" (Dkt. #155, Exhibit 1 ¶ 72). McClung lists the "additional promises given by" JMOS under the alleged implied agreement as follows:

> the principals of JMOS, or JMOS itself, would (a) replace me on all guarantees with the creditors and equipment lessors of JM Oilfield Services, Incorporated, (b) do so by the principals of JMOS, or JMOS itself, acting as guarantors on all such guarantees, (c) payoff or refinance those loans and leases so as to relieve me of any such guarantees, and (d) not subject me (as the supposed guarantor under the Guaranty Agreement with [People's Capital]) to the financial risk of an unreasonable or unnecessary default on any obligation that JM Oilfield Services, Incorporated, had with its creditors and equipment lessors.

(Dkt. #155, Exhibit 1 ¶ 74).

McClung also claims that a "final type of consideration" to McClung for entering the SPA was "the implied one in the SPA that [JMOS] would not operate the business affairs of JM Oilfield

4

Service, Incorporated, in such a reckless manner, which would subject [McClung] to needless financial risk" (Dkt. #98 at p. 37). Notwithstanding this implied promise in the SPA, McClung alleges, JMOS "carelessly filed a voluntary bankruptcy complaint for relief from JM Oilfield Service, Incorporated's debt under Chapter 7" (Dkt. #98 at p. 37). McClung says that as a result of the bankruptcy voluntarily initiated by JMOS, JMOS caused People's Capital, as Marquette's assignee, to declare a default of the MLA (Dkt. #98 at p. 37).

### Procedural History

People's Capital and Leasing, a Connecticut corporation, asserted claims against John Allen McClung, a Texas resident, for breaching the Guaranty Agreement (Dkt. #143). Under this Guarantee Agreement, which the Court briefly addressed above, McClung was the personal guarantor in connection with the lease of certain oilfield equipment by People's Capital to JM Oilfield (Dkt. #143). Chief Judge Orlando L. Garcia of the Western District of Texas granted People's Capital's motion for summary judgment against McClung and entered a final judgment to that effect (Dkt. #143).

McClung, as a third-part plaintiff, sued JMOS, as a third-party defendant for: (1) breach of an implied contract; (2) breach of the covenant of good faith and fair dealing; (3) implied contractual indemnity; (4) equitable indemnification; and (5) contribution (Dkt. #98 at pp. 33–43). On December 17, 2018, having already resolved People's Capital's motion for summary judgment against McClung, Chief Judge Garcia transferred the case to this Court in accordance with the SPA's forum-selection clause (Dkt. #143).

On March 13, 2020, JMOS filed its Motion for Summary Judgment and Brief in Support Thereof (Dkt. #153). McClung responded on June 3, 2020 (Dkt. #154). JMOS replied on June 10, 2020 (Dkt. #160). McClung did not file a sur-reply.

Also, McClung filed a Motion to Strike Evidence in Support of His Opposition to Third-Party Defendant JMOS Acquisition, LLC's Motion for Summary Judgment on June 4, 2020 (Dkt. #159). JMOS responded to that motion on June 18, 2020 (Dkt. #161). Because the Court does not rely on either of the two exhibits that McClung wants stricken, the Court denies this motion as moot. *See infra* note 1.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant

bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

JMOS's summary-judgment motion argues that judgment as a matter of law is proper on all five of McClung's claims against it: (1) breach of an implied contract; (2) breach of the covenant of good faith and fair dealing; (3) implied contractual indemnity; (4) equitable indemnification; and (5) contribution (Dkt. #98 at pp. 33–43; Dkt. #153 at p. 2). The Court agrees: All five of McClung's claims must be dismissed.[1]

---

[1] As a threshold matter, the Court rejects McClung's argument that JMOS's motion should be stricken for procedural and evidentiary deficiencies (Dkt. #154 at pp. 15–16). The standing order quoted by McClung is not the standing order of this Court. And no procedural defect identified by McClung, to the extent there is one, requires the Court to strike JMOS's motion here.

Additionally, McClung argues in his Motion to Strike Evidence in Support of His Opposition to Third-Party Defendant JMOS Acquisition, LLC's Motion for Summary Judgment (Dkt. #159) that JMOS's motion should be stricken for

## I. Breach of an Implied Contract

JMOS argues that it is entitled to summary judgment on McClung's claim for breach of an implied contract—the Court must agree. While McClung vigorously asserts that there is a genuine issue of material fact as to whether an implied contract exists (Dkt. #154 at pp. 17–18), McClung cannot recover on his claim for breach of implied contract as a matter of law since: (1) the SPA covers the subject matter of the parties' dispute here; and (2) the SPA contains a merger clause, precluding any prior implied contract from being enforceable as a matter of law.

Both parties apply Texas law to McClung's claim for breach of an implied contract (Dkt. #153 at p. 8; Dkt. 154 at p. 16 & n.6). To state a claim for breach of an implied contract under Texas law, McClung must show: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

While it is true that the existence of an implied contract is a question of fact,[2] "[t]he existence of a valid, express contract that covers the subject matter of the parties' dispute generally precludes recovery" under an implied contract covering the same subject. *See Stanissis v. DynCorp Int'l LLC*, 3:14-CV-2736-D, 2015 WL 9478184, at *9 (N.D. Tex. Dec. 29, 2015) (Fitzwater, J.) (collecting cases applying Texas law).

McClung does not dispute that the SPA is a valid and binding contract—instead, McClung claims that "[i]n addition to the SPA, [McClung] and [JMOS] entered into an implicit, valid

---

citing to inadmissible evidence (Dkt. #154 at pp. 15–16; Dkt. #159). Since the Court does not rely on either Exhibit 2 or Exhibit 3 in granting JMOS's motion for summary judgment, the Court denies McClung's Motion to Strike Evidence as moot.

[2] *E.g.*, *Double Diamond, Inc. v. Hilco Elec. Co-op., Inc.*, 127 S.W.3d 260, 267 (Tex. App.—Waco 2003, no pet.) (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609–10 (Tex. 1972)).

contract, the existence, and the terms, conditions and provisions of which, were manifested by the conduct of the parties" (Dkt. #98 at p. 40). Specifically, McClung points to "each such party accepting the benefits of the transaction memorialized in the SPA" as the type of "conduct" supporting the existence of an implied contract (Dkt. #98 at p. 40).

McClung elaborates on the supposed implied contract in his declaration, claiming that: "Aside from the SPA, JMOS and I entered into an implicit, valid contract at about the time we were negotiating the terms, conditions and provisions of the SPA." (Dkt. #155, Exhibit 1 ¶ 72). McClung lists the "additional promises given by" JMOS under the implied agreement as follows:

> the principals of JMOS, or JMOS itself, would (a) replace me on all guarantees with the creditors and equipment lessors of JM Oilfield Services, Incorporated, (b) do so by the principals of JMOS, or JMOS itself, acting as guarantors on all such guarantees, (c) payoff or refinance those loans and leases so as to relieve me of any such guarantees, and (d) not subject me (as the supposed guarantor under the Guaranty Agreement with [People's Capital]) to the financial risk of an unreasonable or unnecessary default on any obligation that JM Oilfield Services, Incorporated, had with its creditors and equipment lessors.

(Dkt. #155, Exhibit 1 ¶ 74).

McClung, while claiming that the "implied breach of contract claim transcends the SPA," presents no evidence to support that allegation. In fact, the evidence shows the exact opposite—the SPA covers the subject matter of the parties' dispute.[3] "Texas does not recognize a conflicting implied contract where there is an enforceable express contract between the parties on the same subject." *Dittmann v. D.B. Zwirn & Co., L.P.*, CIV.A.H-09-402, 2010 WL 519692, at *6 (S.D. Tex. Feb. 8, 2010) (citations omitted).[4] This is because "parties should be bound by their express

---

[3] In transferring McClung's third-party claims to this Court under the SPA's forum-selection clause, Chief Judge Garcia of the Western District of Texas held that: "[A]lthough McClung argues that his third-party claims 'transcend' the SPA, the SPA and the transactions contemplated by it are foundational to his claims" (Dkt. #143 at p. 7). While not dispositive, the Court notes the similar holding of a sister court.

[4] There are exceptions, but McClung does not argue that any of the exceptions could be relevant here. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (citing *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966

agreements." *See Craft v. John H. Harland Co.*, CIV.A. 305CV2421-D, 2007 WL 2325590, at *8 (N.D. Tex. Aug. 14, 2007) (Fitzwater, J.) (quoting *First Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.)).

McClung presents no evidence that the alleged implied contract covers a different subject matter from the SPA. To the contrary, McClung asserts that the "additional promises given by" JMOS under the alleged implied contract were that:

- JMOS would replace McClung on all guarantees with the creditors and equipment lessors of JM Oilfield;

- JMOS would pay off or refinance those loans and leases so as to relieve McClung of any such guarantees; and

- JMOS would not subject McClung—as the guarantor under the Guaranty Agreement with People's Capital—to the financial risk of an unreasonable or unnecessary default on any obligation that JM Oilfield had with its creditors and equipment lessors.

(Dkt. #155, Exhibit 1 ¶ 74).

By McClung's own argument, the SPA covers the same subject matter as the alleged implied contract. The SPA:

- Noted that JM Oilfield and Superior Oilfield, while not insolvent, were facing financial and operating challenges such that the two companies would likely be unable to obtain a "going concern" opinion on their financial statements (Dkt. #153 at p. 4; Dkt. #153, Exhibit 1 at p. 1);

---

S.W.2d 467, 469–70 (Tex. 1998)) ("observing that overpayments under a contract can be recovered under a theory of restitution or unjust enrichment.")

- Provided, for the benefit of JM Oilfield and Superior Oilfield, a revolving bridge loan to be used solely for the business purposes of JM Oilfield—JMOS also had complete discretion to provide additional funds to JM Oilfield (Dkt. #98 at p. 35; Dkt. #153, Exhibit 1 at pp. 1–2); and

- Contained a lengthy indemnification clause, where McClung broadly agreed to indemnify JMOS (Dkt. #153, Exhibit 1 at pp. 5–6). JMOS did not agree to indemnify McClung (Dkt. #153, Exhibit 1 at pp. 5–6).

The parties executed the SPA so that McClung could sell its 100% ownership interest in JM Oilfield and Superior Oilfield to JMOS. The SPA was thorough. It contemplated JM Oilfield and Superior Oilfield's ongoing financial concerns. It provided for a bridge loan—to be used for the *business* purposes of JM Oilfield—with the option for JMOS to provide additional capital to JM Oilfield at JMOS's complete discretion. Its nearly page-long indemnification clause explained the scope of McClung's indemnification of JMOS—JMOS did not agree to indemnify McClung. It even joined McClung's wife in order to include any ownership interests she might have had in JM Oilfield and Superior Oilfield in the sale (Dkt. #153, Exhibit 1 at p. 1). Similarly, the alleged implied contract covers the terms of JMOS's purchase of JM Oilfield and Superior Oilfield—the same subject extensively covered by the SPA. *See* (Dkt. #155, Exhibit 1 ¶ 74).

Not to mention, McClung asserts that it was the promises made by JMOS in the alleged implied contract that *resulted in* the parties agreeing to the SPA: McClung claims that both parties evinced their acceptance of the alleged implied contract by "accepting the benefits of the transaction memorialized in the SPA" (Dkt. #98 at p. 40); that the parties entered into the alleged implied contract "at about the time [they] were negotiating the terms, conditions and provisions of the SPA" (Dkt. #155, Exhibit 1 ¶ 72); and that the alleged implied contract resulted in both parties

accepting the "benefits of the stock transaction, resulting in the consummation of the SPA" (Dkt. #154 at p. 17 n.7). McClung's framing of the alleged implied contract—as consideration provided by JMOS to get McClung to agree to the SPA—confirms the Court's conclusion. *See* (Dkt. #153, Exhibit 1 at pp. 1–2, 7–8) (explicitly listing the consideration provided by JMOS, the conditions precedent to the obligations of McClung, and the actions each party would complete at closing before JMOS could purchase 100% of JM Oilfield and Superior Oilfield from McClung). Because there is no genuine dispute of material fact that the SPA and the alleged implied contract both cover the subject matter of the parties' dispute, McClung cannot recover on its claim for breach of implied contract against JMOS as a matter of law.

Also warranting dismissal of McClung's implied-contract claim is the fact that the SPA contained a merger clause.[5] That merger clause precludes McClung from arguing that JMOS breached an implied contract that was allegedly negotiated prior to and during the SPA's drafting and that McClung claims resulted "in the consummation of the SPA" (Dkt. #154 at p. 17 n.7).

A merger clause is a "provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document." *IKON Office*, 125 S.W.3d at 125 n.6 (citation omitted). A merger clause—like the one in the SPA—"achieves the purpose of ensuring that the contract at issue invalidates or supersedes any previous agreements, as well as negating the apparent authority of an agent to later modify the contract's terms." *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011) (citation omitted).

---

[5] *Compare* (Dkt. #153, Exhibit 1 at p. 9) ("[The SPA] represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and may not be amended or modified without the express prior written consent of the parties."), *with IKON Office Sols., Inc. v. Eifert*, 125 S.W.3d 113, 125–26 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that an agreement contained a merger clause when it stated that it "constitutes the entire agreement concerning the subject matter hereof. No modification or waiver hereof shall be binding upon any party unless in writing and signed by or on behalf of the party against which the modification or waiver is asserted").

McClung never argues that the SPA's merger clause is invalid or unenforceable.[6] And yet, McClung claims that the parties entered into the alleged implied contract prior to their execution of the SPA. The SPA's merger clause forecloses McClung's argument. *See Dittmann*, 2010 WL 519692, at *6 ("Plaintiffs contend that a separate oral or implied contract guaranteed payment of their bonuses, in contradiction to the offer letters . . . . Plaintiffs' contentions regarding an oral contract also fail, as their offer letters contain a merger clause clearly precluding changes not in writing . . . .").

McClung and JMOS executed the SPA—an express agreement—and there is no genuine dispute of material fact that the SPA and the alleged implied contract both cover the same subject matter. Even if there was an implied contract exactly as McClung claims, "[b]ecause an express agreement already governs the subject matter of the implied-contract claims, the implied[-]contract claims must be dismissed." *Human Power of N, Co. v. Synergixx, LLC*, 1-17-CV-1065-LY, 2018 WL 3420820, at *3 (W.D. Tex. July 12, 2018), *report and recommendation adopted*, A-17-CV-001065-LY, 2018 WL 4343433 (W.D. Tex. Aug. 2, 2018) (citing *Fortune Prod.*, 52 S.W.3d at 684). And the SPA's merger clause also proscribes McClung's implied-contract claim as a matter of law.

## II. Good Faith and Fair Dealing

McClung's claim for breach of the covenant of good faith and fair dealing fails as a matter of law. McClung asserts that he can show the existence of a special relationship as a matter of

---

[6] McClung does claim that the SPA is only partially integrated, rather than fully integrated (Dkt. #154 at p. 18). The Court is unpersuaded. The SPA's "Entire Agreement" provision definitively explains that the SPA "represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof." From this and the other evidence in the record, it is clear that the parties did not intend for any prior or contemporaneous implied agreement to become part of the SPA. The SPA is fully integrated, and McClung's self-serving parol evidence does not change that fact. *C.f. Cruson v. Jackson Nat'l Life Ins. Co.*, 4:16-CV-00912, 2018 WL 3752853, at *3–5 (E.D. Tex. Aug. 8, 2018).

law, which would then establish a duty of good faith and fair dealing (Dkt. #154 at p. 22). McClung is incorrect.

"Whether a duty of good faith and fair dealing exists between the parties to a contract is a question of law." *Tatum v. Nationsbank of Tex., N.A.*, 05-94-01998-CV, 1995 WL 437413, at *4 (Tex. App.—Dallas July 25, 1995, writ denied) (citing *Cole v. Hall*, 864 S.W.2d 563, 568 (Tex. App.—Dallas 1993, writ dism'd w.o.j.)); *see also Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016) (same). Most states impose an implied duty of good faith and fair dealing into every private contract. *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369 n.13 (Tex. 2019) (citation omitted). But not Texas. *Id.* Instead, "contracting parties owe a good-faith duty only if they expressly agree to act in good faith, a statute imposes the duty, or the parties have a 'special relationship . . . .'" *Id.* (citations omitted). If there is actually a special relationship between two parties, that may give rise to a tort duty of good faith and fair dealing. *Hux*, 819 F.3d at 781 (citing *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987)).

But the finding of a special relationship has been restricted to "narrow and carefully circumscribed situations." *Id.* In fact, the Texas Courts of Appeals have refused to impose a tort duty of good faith and fair dealing in the following relationships: "employer-employee, lender-borrower, medical provider-patient, mortgagor-mortgagee, supplier-distributor, franchisor-franchisee, creditor-guarantor, issuer and beneficiary of a letter of credit, or insurance company-third-party claimant." *Id.* at 781–82 (footnotes omitted) (collecting cases).

McClung asserts that the special relationship here is "evidenced by (1) a borrower-lender arrangement between the parties, and (2) JMOS's active participation in the events leading to the stock transfer transaction" (Dkt. #154 at p. 24). Specifically, McClung claims that during the

negotiation of the SPA, JMOS "sought to develop a personal and business relationship with" McClung, which "eventually convinced [McClung] to enter into the [SPA]" (Dkt. #155, Exhibit 1 ⁋ 87).

McClung's first argument—that the parties had a special relationship as part of their borrower-lender arrangement—fails as a matter of law. McClung points to no decision from the Supreme Court of Texas supporting this argument, and the Texas Courts of Appeals have "refused to impose a tort duty of good faith and fair dealing" in the lender-borrower context. *Hux*, 819 F.3d at 782 & n.8. Making an *Erie*[7] guess then, the Court concludes that if faced with the question, the Supreme Court of Texas would hold that there is no tort duty of good faith and fair dealing in the lender-borrower context—just as the Texas Courts of Appeals have held. *C.f. Hux*, 819 F.3d at 780–81 ("Typically, we treat state intermediate courts' decisions as the strongest indicator of what a state supreme court would do, absent a compelling reason to believe that the state supreme court would reject the lower courts' reasoning.").

McClung's second argument—that JMOS's active participation and negotiation of the SPA created a special relationship—also fails. McClung points to no case law to support his position that JMOS's conduct here created a special relationship. In fact, the only three cases McClung cites to are inapposite. *See* (Dkt. #154 at p. 24) (citing *Caton v. Leach Corp.*, 896 F.2d 939, 946–47 (5th Cir. 1990) (applying California law on the duty of good faith and fair dealing, not Texas law); *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210 (Tex. 1988) (overruled by *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 451 (Tex. 2012); and *Omrazeti v. Aurora Bank FSB*, 12-CV-00730-DAE, 2013 WL 3242520, at *16 (W.D. Tex. June 25, 2013) (analyzing a mortgagor-mortgagee

---

[7] *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

relationship and noting that it was doubtful whether "even 'active participation' by a mortgagee can give rise to the requisite special relationship under Texas law").

And no such special relationship could exist under the facts here; there is no rationale for finding a special relationship between McClung and JMOS under Texas law. One of the few special relationships recognized by Texas law—that between an insurer and its insured—was found to exist because:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 280 (Tex. 1998) (quoting *Arnold*, 725 S.W.2d at 167).

Here, McClung and JMOS both freely negotiated the SPA and entered into it only after receiving "independent legal advice from counsel of their choice as to the advisability of executing" the SPA (Dkt. #153, Exhibit 1 at p. 10). Unlike in the insurer-insured special relationship, the bargaining power between McClung and JMOS was not vastly unequal. Nor did JMOS exercise any "exclusive control" over McClung or McClung's financial interests like an insurer exercises over its insured.

Not to mention, the evidence McClung submits shows *at most* that JMOS "sought to develop a personal and business relationship with" McClung, which "eventually convinced [McClung] to enter into the [SPA]" (Dkt. #155, Exhibit 1 ¶ 87). If this were sufficient to establish a special relationship between McClung and JMOS, then the exception would swallow the rule; rather than cabining special relationships to "narrow and carefully circumscribed situations," nearly every contractual negotiation would establish a duty of good faith and fair dealing under so

16

long as one party eventually persuaded the other to sign the contract. But that is plainly not the law in Texas. Accordingly, McClung's claim for breach of the covenant of good faith and fair dealing fails as a matter of law.[8]

### III. Implied Contractual Indemnity and Equitable Indemnification

McClung's third and fourth claims—for implied contractual indemnity and equitable indemnification—fail as a matter of law. McClung argues that the existence of a special relationship between him and JMOS proves the viability of these two claims (Dkt. #154 at p. 27). But the Court has already concluded that no special relationship exists as a matter of law, see *supra* Part II. This argument fails.

McClung's only other argument is that he may assert a noncontractual indemnification claim against JMOS under Texas common law. Not so. First, "[t]he only remaining vestiges of common law indemnity involve purely vicarious liability or the innocent product retailer situation." *Gunn v. McCoy*, 554 S.W.3d 645, 677 (Tex. 2018) (alteration in original) (quoting *Aviation Office of Am., Inc. v. Alexander & Alexander of Tex., Inc.*, 751 S.W.2d 179, 180 (Tex. 1988) (per curiam)). McClung baldly claims that the vicarious-liability situation applies here

---

[8] McClung makes two other arguments: (1) JMOS breached the duty of good faith and fair dealing that is encompassed within both the Uniform Commercial Code and the Texas Business and Commerce Code; and (2) there is a fact question on whether JM Oilfield is JMOS's alter ego, which presents a fact question on McClung's good-faith-and-fair-dealing claim. Neither argument moves the needle.

First, as McClung himself acknowledges, Section 1.304 of the Texas Business and Commerce Code does not establish a separate cause of action in tort (Dkt. #154 at p. 25 n.11). "[T]his Business and Commerce Code provision is not applicable where no specific obligation exists." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 490 (Tex. 2019). So because McClung provides no "specific duty or obligation to which the good-faith standard could be tied," McClung's first argument is irrelevant. *See id.* (citation omitted). And second, McClung provides no case law—and the Court is aware of none—explaining how alter-ego or veil-piercing theories can independently impose liability for an alleged breach of the duty of good faith and fair dealing. *See Dodd v. Savino*, 426 S.W.3d 275, 291 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Alter ego, or piercing the corporate veil, is not an independent cause of action, but is instead a means of imposing liability for an underlying cause of action."). Thus, McClung cannot rely on an alter-ego theory to defeat summary judgment when there is no underlying claim as a matter of law.

(Dkt. #154 at p. 28). McClung does not even attempt to explain the type of relationship that he claims made McClung vicariously liable for JMOS's conduct (Dkt. #154 at p. 28). With no evidence to support this assertion, McClung cannot defeat summary judgment.

Also, the SPA contains a lengthy, thorough indemnification clause—in that indemnification clause, McClung broadly agreed to indemnify JMOS (Dkt. #153, Exhibit 1 at pp. 5–6). There was no reciprocity (Dkt. #153, Exhibit 1 at pp. 5–6). Under Texas law, "[a]n agreement which states that one party will indemnify another is binding and effective. No statutory or common law principles other than those that govern the construction of contracts usually alter the validity of an indemnity agreement." *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 831 (5th Cir. 1992). Thus, McClung's claims for implied contractual indemnity and equitable indemnification fail as a matter of law.[9]

### IV. Contribution

McClung's final claim—for contribution—also fails as a matter of law. "The essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability." *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 21 (Tex. 1987). McClung does not establish that either of these requirements have been met—McClung does not identify any judgment finding McClung and JMOS to be joint tortfeasors,[10] nor does McClung claim that he paid a disproportionate share of some common liability shared by the parties. In fact, all McClung

---

[9] To the extent that McClung argues that his indemnification claims arise out of the alleged implied contract between him and JMOS, his indemnification claims suffer the same fatal defect as his breach of implied contract claim. *See supra* Part I.

[10] McClung insinuates that the tort is JMOS's breach of the duty of good faith and fair dealing (Dkt. #154 at p. 29). Not only is there no judgment finding McClung and JMOS to be joint tortfeasors for this tort, but as the Court explained, McClung's claim for an alleged breach of the duty of good faith and fair dealing is legally infirm. *See supra* Part II.

does is identify that there is a legally cognizable right to seek contribution in Texas (Dkt. #154 at p. 29). True. But simply identifying that there is a claim for contribution under Texas law is not enough to create a genuine issue of material fact as to its existence here.

McClung has not provided any evidence showing the existence of a genuine question of material fact on its contribution claim. Because there is no question that McClung cannot meet the "essential" two prerequisites for a contribution claim under Texas law, JMOS is entitled to summary judgment on McClung's final claim.[11]

## CONCLUSION

It is therefore **ORDERED** that JMOS Acquisition, LLC's Motion for Summary Judgment and Brief in Support Thereof (Dkt. #153) is hereby **GRANTED**.

Third-party plaintiff John Allen McClung's claims for breach of an implied contract, breach of the covenant of good faith and fair dealing, implied contractual indemnity, equitable indemnification, and contribution are **DISMISSED with prejudice**.

**SIGNED this 4th day of August, 2020.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[11] McClung claims that *Beech* is inapplicable since it only foreclosed a settling party from having statutory or common-law contribution rights, which is not the situation here (Dkt. #154 at p. 29 & n.13). But that observation does not make the general principles discussed in *Beech* irrelevant. Indeed, the relevant principle from *Beech*—discussing the two "essential prerequisites for a contribution claim"—is applicable to McClung's contribution claim. *See Nabors Completion & Prod. Services Co. v. Chesapeake Operating, Inc.*, 648 F. App'x. 393, 398 (5th Cir. 2016) (citing *Beech* for the proposition that "an adverse judgment is an 'essential prerequisite to contribution'"); *Arnold v. Garlock Inc.*, 288 F.3d 234, 237 (5th Cir. 2002) ("The essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability."); *see also Tex. Dep't of Transp. v. City of Floresville Elec. Power & Light Sys.*, 53 S.W.3d 447, 456 (Tex. App.—San Antonio 2001, no pet.).